# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| **William Tate,** *et al.* | ) |
|       **Plaintiffs,** | )    3:14-cv-0242 JWS |
|       vs. | )    **ORDER AND OPINION** |
| **United States of America,** *et al.* | )    [Re: Motion at docket 86] |
|       **Defendants.** | ) |

## I. MOTION PRESENTED

At docket 86 defendants Advantage RN, LLC, Cheryl Chapman, and Sheryl Snyder (collectively, "Advantage") move for summary judgment under Federal Rule of Civil Procedure 56. Defendant United States of America joins in Advantage's motion at docket 97. Plaintiffs William Tate, *et al.* ("Plaintiffs") oppose the motion at docket 98, supported by a memorandum at docket 99 and declarations at dockets 100 and 101. Advantage replies at docket 104. Oral argument was heard on March 3, 2017.

## II. BACKGROUND

This medical malpractice action arises from treatment that plaintiff Cynthia Tate ("Tate") received at the Maniilaq Health Center Emergency Room on October 19, 2013. Tate's medical records show that she presented at the Emergency Room at 5:36 p.m.

that evening complaining of stomach pain and vomiting, with an acuity level of 4.[1] She was triaged by Mark Hrinko, RN ("Hrinko"),[2] but was not put on a cardiac, blood pressure, or pulse-oximetry monitor. Dr. Mary Gwai-Chore examined Tate and ordered an IV and two IV medications.[3] Hrinko then returned to complete Tate's assessment.[4]

At 7:00 p.m. Sheryl Snyder RN ("Snyder") and Cheryl Chapman RN ("Chapman") began their shift.[5] Tate's records show that Paul Moughamian RN ("Moughamian") started the IV line at 7:00 p.m.[6] After administering the two IV medications, Moughamian started Tate on 1,000 milliliters of saline.[7] Dr. Gwai-Chore testified that she returned to Tate's room at 7:35 p.m. to reevaluate Tate.[8]

It is undisputed that by 7:50 p.m., when Snyder checked on Tate, Tate had gone into cardiac arrest and was non-responsive.[9] Snyder called out a code[10] and CPR was administered,[11] but the record is unclear regarding whether it was Snyder or defendant Doug Amis, P.A. ("Amis") who started CPR. Snyder testified that she started CPR

---

[1] Doc. 86-3 at 1.

[2] *Id.*

[3] *Id.* at 3.

[4] *Id.* at 1.

[5] Doc. 86 at 8; doc. 99 at 12.

[6] Doc. 86-3 at 2.

[7] *Id.*

[8] Doc. 86-2 at 78.

[9] Doc 86-2 at 86-88; doc. 100-1 at 2. Tate's "rhythm on the monitor was asystole." Doc. 100-1 at 2.

[10] Code is a "[t]erm used in hospitals to describe an emergency requiring situation-trained members of the staff, such as a cardiopulmonary resuscitation team, or the signal to summon such a team." STEDMAN'S MEDICAL DICTIONARY (2014).

[11] Doc. 100-1 at 2.

immediately after calling code[12] and Amis ran into the room and took over while Snyder retrieved the crash cart.[13] Amis testified that after code was called he entered Tate's room and "initiated CPR."[14] He could not "definitively say" who else was in Tate's room when he arrived.[15] Tate's "code sheet" states that CPR was initiated by Amis.[16]

Moughamian testified that when he approached Tate's room Amis was already performing CPR and others were hooking Tate up to the crash cart.[17] Moughamian then began recording the code.[18] Because the code records begin at 7:55 p.m.,[19] Tate contends that there was a 5-minute delay between when Snyder discovered Tate non-responsive and when CPR was initiated.[20] Advantage disputes this.[21]

Tate survived but she has "never regained consciousness and has since been in a persistent vegetative state due to hypoxic encephalopathy,"[22] which is brain damage caused by the lack of adequate oxygenation of the brain.[23] Plaintiffs sued defendants for malpractice, alleging that they breached the standard of care for their respective

---

[12]Doc. 86-11 at 3 p.70:6–7.

[13]*Id.* at 5 p.73:20–25. A crash cart is a cart "carrying medicine and equipment for use in emergency resuscitations." OXFORD ENGLISH DICTIONARY, https://en.oxforddictionaries.com/definition/crash_trolley.

[14]Doc. 86-12 at 4 p.56:9–14.

[15]*Id.* at 3 p.54:5–7.

[16]Doc. 86-3 at 4.

[17]Doc. 86-13 at 4–5 pp.78:6–8, 79:4–6.

[18]*Id.* at 5 p.79:7–25.

[19]Doc. 86-2 at 68 at p.68:12–16; doc. 86-3 at 4; doc. 86-14 at 1.

[20]Doc. 99 at 6.

[21]Doc. 104 at 7.

[22]Doc. 100-1 at 2.

[23]*Id.*

fields or specialities by: (1) "failing to properly triage;" (2) "failing to properly monitor and reassess;" (3) "failing to start immediate resuscitation efforts after Ms. Tate was found unresponsive;" and (4) "failing to properly manage the code."[24] Chapman, Snyder, and their employer, Advantage RN, LLC, presently move for summary judgment.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[25] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[26] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[27] However, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[28]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[29] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[30] Once the moving party has met this burden, the nonmoving party

---

[24] Doc. 36 at 5 ¶ 19.

[25] Fed. R. Civ. P. 56(a).

[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[27] *Id.*

[28] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[29] *Id.* at 323.

[30] *Id.* at 323–25.

must set forth evidence of specific facts showing the existence of a genuine issue for trial.[31] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[32] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[33]

## IV. DISCUSSION

**A.   Advantage Is Not Liable for Failing to Properly Triage or Manage the Code**

Advantage argues that it cannot be held liable for failing to properly triage or manage the code because Plaintiffs lack any evidence in support of either claim. By expressly abandoning their failure to triage claim against the Advantage defendants[34] and implicitly abandoning their failure to manage the code claim against the Advantage defendants (by not coming forth with any evidence of code mismanagement), Plaintiffs have abandoned both claims against Advantage.

**B.   Plaintiffs' Failure to Promptly Resuscitate Claim Against Advantage Fails As a Matter of Law**

Plaintiffs allege that the Advantage defendants committed malpractice by waiting five minutes before starting resuscitation.[35] The only evidence Plaintiffs offer in support of this claim is the fact that the first entry on Tate's code sheet, from 7:55 p.m., states that Tate had developed asystole and "compressions started."[36] Plaintiffs' reliance on

---

[31]*Anderson,* 477 U.S. at 248–49.

[32]*Id.* at 255.

[33]*Id.* at 248–49.

[34]Doc. 99 at 12.

[35]Doc. 86-3 at 4; doc. 86-14 at 1.

[36]Doc. 86-3 at 4.

this entry is misplaced because the record shows that CPR was already underway by the time the code charting commenced. Moughamian testified that CPR was already underway when he started recording the code. Thus, either Snyder or Amis began CPR at some point before 7:55 p.m. Snyder testified that she began CPR immediately after calling code, and Amis testified that he went straight to Tate's room when he heard the code and began CPR. Because no evidence supports Plaintiffs' claim that there was a five-minute delay between when Snyder discovered Tate non-responsive and when CPR was commenced, Plaintiffs' failure to promptly resuscitate claim against the Advantage defendants fails as a matter of law.

**C. Plaintiffs' Failure to Monitor Claim Is Not Necessarily Barred by the Alaska Supreme Court's Likely Rejection of the Lost Chance Rule**

Advantage argues that Plaintiffs' remaining claim for failure to properly monitor Tate lacks merit because (1) Plaintiffs cannot show by a preponderance of the evidence that Advantage's alleged negligence caused Tate's injuries and (2) Plaintiffs cannot recover under the lost chance rule because the rule is not recognized in Alaska. The court will address Advantage's arguments in reverse order.

### 1. *Crosby v. United States*

The lost chance rule arises in cases where the plaintiff with a preexisting condition cannot show by a preponderance of the evidence that the defendant's negligence, as opposed to the preexisting condition, caused the plaintiff's ultimate injury. This fact pattern commonly arises in the context of medical malpractice cases where the plaintiff alleges untimely diagnosis or treatment.[37] If the evidence shows, for example, that "the patient might have had only a 40% chance of living" if "diagnosis and treatment had been timely" and the defendant's negligence completely deprived her of that chance, the plaintiff cannot "prove by a preponderance of the evidence that the

---

[37] *See* Dan B. Dobbs, *et al.*, THE LAW OF TORTS § 196 (2d ed. 2016).

defendant caused the patient's death."[38] To the contrary, "the probability is 60% that the defendant did *not* cause the death in spite of his negligence."[39] Under these circumstances, some courts allow the plaintiff to recover under what has become known as the lost chance rule, which comes in two versions.[40]

Under one version, sometimes referred to as the "separate injury" version,[41] the lost opportunity itself is characterized as the plaintiff's legally cognizable harm and valued accordingly.[42] "When the plaintiff provides evidence quantifying her chances for survival, the easiest calculation is one that discounts total damages by the plaintiff's chance."[43] Using the above example, the defendant would be liable for 40% of the plaintiff's total damages.[44] Although the defendant may not have caused the plaintiff's unfavorable outcome, the defendant is liable for causing the loss of the plaintiff's chance of avoiding that outcome.[45] "This version does not actually affect the substantive test of causation; it merely changes the definition of the injury. The plaintiff can prove causation for that injury under the traditional 'but for' test."[46]

---

[38]*Id.*

[39]*Id.* (emphasis in original).

[40]*See* RESTATEMENT (THIRD) OF TORTS § 4 reporter's note to cmt. f (2000) (collecting cases).

[41]*See, e.g., Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 402 (Tex. 1993).

[42]*See* RESTATEMENT (THIRD) OF TORTS § 26 cmt. n (2010).

[43]Dan B. Dobbs, *et al.*, THE LAW OF TORTS § 196 (2d ed. 2016).

[44]*Id.*

[45]*Id.*

[46]RESTATEMENT (THIRD) OF TORTS § 4 reporter's note to cmt. f (2000). *See also* RESTATEMENT (THIRD) OF TORTS § 26 cmt. n (2010) ("Once the harm is reconceptualized as the lost opportunity, the factual-cause inquiry changes.").

The second version of the lost chance rule, sometimes referred to as the "relaxed causation" version,[47] "actually changes the standard for proving causation."[48] It allows a plaintiff to recover an award for the entire loss if the defendant's negligence was a "substantial factor" in producing the harm, disregarding the fact that the harm was likely to occur even if the defendant had not been negligent.[49] "Not all the cases that permit a full recovery are explicit about the reasoning," but the general idea is that full recovery is appropriate because the defendant's negligence combined with the preexisting condition to create a single indivisible injury.[50]

In 1999 this court, in *Crosby v. United States,* held that the Alaska Supreme Court would likely decline to adopt either version of the lost chance rule.[51] The court provided five reasons for its holding. Two reasons were case-specific,[52] but the remaining three apply generally.

First, the court held that the lost chance rule "disrupts traditional causation principles set forth" at AS 09.55.540, which "clearly and unambiguously requires plaintiffs to establish that a defendant's alleged negligence was more likely than not the

---

[47]*See, e.g., Kramer*, 858 S.W.2d at 401.

[48]RESTATEMENT (THIRD) OF TORTS § 4 reporter's note to cmt. f (2000).

[49]*See* Dan B. Dobbs, *et al.*, THE LAW OF TORTS § 196 (2d ed. 2016); RESTATEMENT (THIRD) OF TORTS § 4 cmt. f (2000) ("In some jurisdictions, the lost-chance doctrine allows a plaintiff to recover damages for the entire injury on a showing that the defendant substantially increased the risk of that injury.").

[50]Dan B. Dobbs, *et al.*, THE LAW OF TORTS § 196 (2d ed. 2016).

[51]48 F.Supp.2d at 924, 931–32 (D. Alaska 1999). The court also discussed a third version of the lost chance rule that is based on the Restatement (Second) of Torts § 323. *Id.* at 926. But, as the court noted, § 323 does not support the rule because that section addresses duty, not causation. *Id.* at 927 n.12. *See also* RESTATEMENT (THIRD) OF TORTS § 26 reporter's note to cmt. n (2010) (courts' "reliance on § 323 is misplaced.").

[52]48 F. Supp. 2d at 931–32 (the plaintiff had not identified which version of the lost chance rule she wanted the court to apply and her cause of action was for wrongful death, not general negligence).

-8-

cause of injury."[53] "Recognizing a 'loss of chance' theory," the court reasoned, "would enable [a] plaintiff to recover even when her injury was not proximately caused by the defendant."[54] Because the "separate injury" version does not affect the causation requirement, this reason applies only to the "relaxed causation" version of the lost chance rule.

Second, the court held that "the 'loss of chance' doctrine in medical malpractice cases involves significant and far-reaching policy concerns affecting the quality and cost of health care which are best left to the Alaska State Legislature to address and resolve."[55] And third, if the Alaska Legislature were to consider whether to adopt the lost chance rule, it would likely be persuaded by the arguments against adopting the rule, in part because the rule is ill-suited to the realities of medical care in rural Alaska where providers "cannot make all potentially beneficial tests and procedures available at anything approaching a reasonable cost."[56]

### 2. Post-*Crosby* developments

In the almost eighteen years since *Crosby* was decided, neither the Alaska Supreme Court nor the Alaska Legislature has definitively resolved whether the lost

---

[53]48 F. Supp. 2d at 931.

[54]*Id.*

[55]*Id. See also Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1241 (Alaska 2003) ("These policy choices are for the legislature. Our job here is to determine what choice the legislature made."); *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1054 (Alaska 2002) (quoting *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974)) ("The plaintiffs ask us to delve into questions of policy formulation that are best left to the legislature. As we have noted previously, '[i]t is not a court's role to decide whether a particular statute or ordinance is a wise one; the choice between competing notions of public policy is to be made by elected representatives of the people.'"); *Universal Motors, Inc. v. Neary*, 984 P.2d 515, 517 (Alaska 1999) ("Whether the benefit from the additional incentive for joining all potentially liable actors supplied by the one-action rule is outweighed by the detriment resulting from the complications of multi-party litigation is a policy question best left to the legislature.").

[56]*Crosby*, 48 F. Supp. 2d at 932.

chance rule is good law in Alaska.[57] The Alaska Supreme Court came close to doing so in 2012 when it granted a petition for review that addressed the issue, but the court dismissed the petition as improvidently granted because it was split "on the question whether the loss-of-chance doctrine is consistent with Alaska law."[58] In the absence of a definitive resolution to this question, plaintiffs continue to bring lost chance claims in Alaska courts.[59] Nevertheless, there have been no developments indicating that *Crosby* was wrongly decided, and the court stands by its prediction that the Alaska Supreme Court will not recognize the lost chance rule.

### 3. Advantage has not established that Plaintiffs must rely on the lost chance rule

Plaintiffs' failure to monitor claim is only extinguished by *Crosby* if Plaintiffs cannot show by a preponderance of the evidence that defendants' negligence caused Tate to suffer her ultimate injury. Advantage argues that Plaintiffs cannot do so here

---

[57] Two post-*Crosby* courts appear to conclude that the Alaska Supreme Court has generally recognized the lost chance rule. *Wright v. St. Mary's Med. Ctr. of Evansville, Inc.*, 59 F. Supp. 2d 794, 801 n.2 (S.D. Ind. 1999) ("Some courts have viewed chances as interests worthy of protection in their own right . . . .") (citing, *inter alia*, *Van Gulik v. Resource Dev. Council for Alaska, Inc.*, 695 P.2d 1071, 1073–74 (Alaska 1985) (plaintiff could recover damages proportional to lost chance of winning lottery under Restatement (Second) of Contracts § 348(3)); *Milam v. Dominick's Finer Foods, Inc.*, 588 F.3d 955, 958 (7th Cir. 2009) ("Loss of a chance—a probabilistic injury—is a proper damages theory.") (citing, *inter alia*, *DeNardo v. GCI Commc'n Corp.*, 983 P.2d 1288, 1290–92 and n.9 (Alaska 1999) (plaintiff could have recovered damages under *Van Gulik* based on lost chance of winning sweepstakes prizes)). *Van Gulik* and *DeNardo* are inapposite, however, because they involve contract law and a lost chance to win, which is simply not the factual situation presented in medical malpractice cases. *Compare, e.g., Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 29 (Fla. Dist. Ct. App. 1990) (recognizing lost chance rule in contract case), *with Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1020 (Fla. 1984) (rejecting lost chance rule in medical malpractice case).

[58] *Dobbins v. Providence Alaska Med. Ctr.*, No. S-13334 (Alaska Jan. 27, 2012) (order dismissing petition).

[59] *See, e.g., Hagen v. Strobel*, 353 P.3d 799, 801 (Alaska 2015) (estate claimed that cardiologists' failure to relay radiologist's recommendations to patient "failed to meet prevailing standards of medical care, resulting in a lost chance of survival" for patient with lung cancer).

because Plaintiffs' expert, Dr. Diane Sixsmith, cited a study published in *The Lancet*[60] that found that only 15.4% of all patients who experience in-hospital cardiac arrest survive to discharge,[61] and a portion of the surviving patients suffer either severe disability, coma or vegetative state, or brain death.[62] Advantage argues that the *Lancet* study shows that once Tate went into cardiac arrest she had less than a 15% chance of avoiding death or severe disability, and therefore Plaintiffs cannot show that Advantage's negligence was the likely cause of her injury.[63]

The *Lancet* study and the various other studies that Advantage cites[64] might seem to support a verdict in Advantage's favor. But, because these general studies do not definitively establish *Tate's* own probability of suffering injury, and Plaintiffs have set forth sufficient contrary evidence, a genuine dispute as to material fact precludes summary judgment.

As Plaintiffs point out, Advantage's studies do not take into consideration all of the variables that are in play in this case, including the alleged provider negligence and Tate's individualized risk factors given her relatively young age and otherwise good health.[65] According to Dr. Sixsmith, "most" of the patients in the *Lancet* study were "considerably more ill and [had] significant pre-existing pathology compared to Ms. Tate."[66] Indeed, the fact that Tate was among the 15% who survived in-hospital

---

[60]Doc. 100-2 at 2.

[61]Doc. 86-4 at 5.

[62]*Id.* at 2 (defining a "favourable [sic] neurological status" as either "no major disability" or "moderate disability," as opposed to "severe disability, coma or vegetative state, and brain death"); doc. 86-4 at 5 (stating that 80.6% of patients "who survived to discharge and had assessments of cerebral performance category had a favourable [sic] neurological status.").

[63]Doc. 86 at 7.

[64]*Id.* at 6.

[65]Doc. 99 at 21-22.

[66]Doc. 100-2 at 2.

-11-

cardiac arrest provides some support for Dr. Sixsmith's assertion that Tate's circumstances were anomalous. On top of that, Dr. Sixsmith has offered her opinion that Tate's injury "was caused by circumstances surrounding her resuscitation;"[67] it is "more likely than not" that Tate's injury would not have occurred had she "been appropriately monitored and observed;"[68] and it is likely that Tate would have survived the cardiac arrest "with her brain intact, meaning without lasting hypoxic injury or damage," but for defendants' negligence.[69] This evidence is sufficient to create a genuine dispute as to material fact.

### V. CONCLUSION

For the reasons set forth above, Advantage's motion at docket 86 is GRANTED IN PART and DENIED IN PART as follows: judgment will be entered in Advantage's favor on Plaintiffs' claims against the Advantage defendants for failure to triage, failure to manage the code, and failure to promptly resuscitate. In all other respects, Advantage's motion is denied. This order does not resolve any of Plaintiffs' claims against any of the remaining defendants.

DATED this 6th day of March 2017.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

---

[67]Doc. 100-1 at 2.

[68]*Id.* at 3.

[69]Doc. 100 at 2 ¶ 7.