# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | | |
|---|---|---|
| **WILLIAM TATE, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **3:14-cv-242 JWS** |
| | ) | |
| **vs.** | ) | **ORDER AND OPINION** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **Findings of Fact and** |
| | ) | **Conclusions of Law** |
| **Defendant.** | ) | |
| | ) | |

## I. INTRODUCTION AND STATEMENT OF JURISDICTION

This Federal Tort Claims Act medical malpractice action was tried to the court from May 8, 2017, through May 16, 2017, in Anchorage, Alaska. It is undisputed that the medical care, which is the subject of this action, was rendered by agents of the United States acting within the scope of their authority, and that the United States is responsible for their actions. A timely administrative claim was filed, and subsequently denied. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 2671, *et seq.* and 28 U.S.C. § 1346(b)(1).

Pursuant to Federal Rule of Civil Procedure 52, the court sets out its findings of fact and conclusions of law below.

## II.  FINDINGS OF FACT

1.  Plaintiffs in this lawsuit are William Tate, individually, and William Tate and Susie Sours, as Co-Guardians of Cynthia Tate, and M.T., G.T., M.T., T.T. and  M.T., who were minor children at the time litigation commenced.  At the time of trial, one of the minors named as M.T. was a 21-year-old married adult living in Virginia, named Martha Hacker.  The minor identified as G.T. was deceased at the time of trial.

2.  William Tate ("William") is the husband of Cynthia Tate ("Cynthia"), and the father of her children named as plaintiffs in this action.  At the time of trial, William was living in Kotzebue, Alaska.  He has long been, and at the time of trial continued to be, employed as a merchant mariner spending about six months of each year away from his home.

3.  Susie Sours ("Susie") is Cynthia's niece.  Susie was raised by Cynthia in Kotzebue, Alaska.   At the time of trial, Susie was a young adult living in Anchorage, Alaska, where she was taking care of Cynthia's children and Susie's own three children.

4.  On October 19, 2013, Cynthia was a 45-year-old Alaska Native woman living in Kotzebue, Alaska, with her husband William, her children, and Susie.  At the time of trial, Cynthia was housed and cared for at the Sandra Baker intensive care nursing home in Glendale, Arizona ("Sandra Baker Home").  When Cynthia was moved to Arizona, Susie was living there.

5.  Defendant in this action is the United States of America ("United States").  The individuals for whose actions the United States is responsible in this lawsuit are Mark Hrinko, R. N. ("Hrinko"), Paul Moughamian, R.N. ("Moughamian"), and Mary M. Gwayi-Chore, M.D. ("Gwayi-Chore").

2

6.  The events giving rise to this lawsuit occurred on October 19, 2013, at the Manilaq Medical Center in Kotzebue, Alaska ("MMC").

7.  On October 19, 2013, MMC was converting from paper patient charts to electronic patient charts.  Older records were still in paper format.

8.  Cynthia walked into the MMC emergency room at 5:36 PM, or 1736 hours (all times stated in the findings below reference the 24 hour clock).  She checked in at the front desk.  Cynthia signed a form consenting to medical treatment.

9.  Standard practice at MMC was to call for the patient's paper chart at the time of check in at the front desk.

10.  Cynthia complained of nausea, vomiting, and epigastric pain.  She rated her pain as an 8 on a scale of 1 thru 10.

11.  Cynthia was triaged by Hrinko starting at 1750.  The precise time triage was completed is not clear from the record, but triage should not have taken more than ten minutes.  Certainly triage had been completed prior to 1832 when Gwayi-Chore began her exam of Cynthia.

12.  During triage, Hrinko took Cynthia's vital signs, all of which fell within normal ranges.  He also found her airway to be clear, and her respiratory system to be within normal limits.  His exam of Cynthia's cardiac and circulatory system showed no signs of problems.  The results of Hrinko's exam of her neurologic and musculoskeletal systems yielded results within normal limits. Cynthia was oriented and conversed with the nurse. Hrinko knew that Cynthia rated her pain level at 8.  At 1800 Hrinko noted that Cynthia was grimacing and teary.  He also noted that she described the pain as similar to heartburn.  He knew that she had been vomiting.  He did not ask her when she last

vomited. He did not inquire as to the contents of her emesis. He did not ask Cynthia when she last could retain fluids or food. He noted that the onset of pain was on October 18. Hrinko's triage notes indicate that Cynthia had not been consuming alcohol. Hrinko testified at trial that Cyhthia told him she had consumed a box of wine at some point prior to coming to MMC on October 19. He admitted that he left this out of the chart notes. Hrinko did not review MMC's paper chart on Cynthia.

13. MMC's paper chart shows that Cynthia's last prior visit to the MMC emergency room was on Saturday, May 19, 2012, when she presented at 2035 complaining of throwing up since Thursday. She was triaged at level 3. The triage note shows normal vital signs, including a pulse of 89. The chart shows that an EKG was performed and that Cynthia was placed on cardiac monitoring (telemetry). The EKG results included an episode of slower than normal heart rate and episodes of a prolonged QT interval indicating an electrical abnormality in Cynthia's heart. The cardiac monitoring showed ventricular arrhythmias, including two runs of non-sustained ventricular tachycardia (an abnormally high heart beat while at rest). Ventricular tachycardia may precede ventricular fibrillation (a condition in which the heart beat is irregular and weak and the heart is no longer able to pump blood), which in turn may precede asystole (cardiac arrest). The results of the 2012 EKG and telemetry were in Cynthia's paper chart.

14. On October 19, 2013, Hrinko rated Cynthia at acuity level 4 on the 5 level acuity scale used at MMC, a scale commonly used at medical facilities in the United States. On that scale a patient rated at level 1 requires immediate life saving intervention. A patient rated at level 2 requires monitoring every 15 to 30 minutes. A

patient rated at a level 4 requires monitoring at least every two hours.  MMC's policy states that a level 2 acuity level should be assigned to a patient perceived as high risk, or seen to be confused, lethargic or disoriented, or in severe pain.  Severe pain is pain at level 7 or higher as rated by "clinical observation and/or patient rating."  (Exhibit 9) Hrinko should have rated Cynthia at acuity level 2 based on all of the circumstances of her presentation and including the information in her paper chart.

15.  During triage, Hrinko took Cynthia's vital signs, all of which were within normal limits.  Cynthia's vital signs were not measured thereafter.  Hrinko did not connect Cynthia to any electronic monitoring.  Hrinko finished his shift and left MMC prior to the time that Cynthia was found unresponsive.

16.  Cynthia was the only patient in the MMC emergency room while she was there.  After triage, Cynthia was placed in Treatment Room B located immediately across the hall from the nurses' station.  At MMC, the doors to the treatment rooms close automatically.  Treatment Room B was equipped with a pulse oximeter, a blood pressure monitor, and a cardiac monitor, all of which were linked to displays at the nurses' station.  If a monitor were being used on a patient, an alarm would sound if the monitor's reading moved outside the appropriate range.

17.  Moughamian was also on duty when Cynthia arrived at MMC.  After Gwayi-Chore examined Cynthia, she ordered that Cynthia be placed on an intravenous fluid and that she be given Protonix, an anti-reflux drug, and Zofran, a nausea medication.  Moughamian was the nurse who connected the intravenous line and administered the medications.  He placed the IV line at about 1900.  He gave her Protonix at 1908 and Zofran was at 1910. The IV profusion of lactate ringers ("LR") began at 1922.

18.  Cynthia was not connected to pulse oximetry, blood monitoring or cardiac monitoring when Moughamian went into her room, and he did not connect her to any of the monitors.  Cynthia did not object to connection of the IV or administration of the drugs.  A blood sample could have been drawn easily and quickly when the IV line was being connected to the patient, but no blood was drawn.

19.  Moughamian last observed Cynthia about 1922 and noted that she was resting in bed, breathing easily with no labored breath and that she was fully oriented.  Moughamian reported what he saw to the night shift nurses.

20.  Gwayi-Chore, who was born and received much of her education in Kenya, was licensed to practice medicine in Alaska in 2010.  She is board certified in family practice medicine.

21.  Gwayi-Chore began her examination of Cynthia about 1832.  Before doing so, she looked at the triage sheet and the electronic patient chart.  She did not look at Cynthia's paper chart.

22.  Gwayi-Chore took Cynthia's history.  She noted that Cynthia was complaining of epigastric pain with an onset around 0200 with nausea and vomiting since then.  Cynthia denied having diarrhea or constipation.  Cynthia denied having chest pain.  Cynthia reported her last consumption of alcohol was three days earlier.

23.  Gwayi-Chore's examination found Cynthia to be alert and not in acute distress.  The abdominal exam disclosed normal bowel sounds.  The abdomen was not distended, and it was soft.  Gwayi-Chore found epigastric tenderness, but without any guarding or rebound tenderness.  Stethescopic respiratory exam showed clear breathing and no abnormal sounds.  Stethescopic cardiac exam disclosed normal heart

6

sounds with no murmers, gallops or rubs.  Gwayi-Chore made no diagnosis of Cynthia's condition.

24. Gwayi-Chore testified that she advised Cynthia that she wanted to do some testing to include an EKG, urine testing, and blood testing.  Gwayi-Chore testified that Cynthia declined to have those tests done because she wanted to go home.

25.  Gwayi-Chore did not mention Cynthia's declination of testing in her chart note.  Neither did she mention Cynthia's declination in her lengthy progress note dated October 19, and signed by Gwayi-Chore on October 21. The progress note does indicate that Cynthia wanted to go home to be with her three-year-old child.

26.  The progress note also reports that Cynthia said she had consumed a small amount of wine before arriving at the ER.

27.  Several witnesses used some variant of the word "Code" in their testimony.  The word is used when a patient's condition suddenly deteriorates to the point that life saving intervention is needed immediately.   The word may be either a noun–as in "a Code was called"–or a verb–as in "the patient Coded."

28.  Sheryl Snyder, RN, who had come on duty at 1900, entered Cynthia's room at 1950, found Cynthia unresponsive, and called the Code.

29.  Shortly after the Code was called, Dr. Chowdary, who had just come on duty, relieved Gwayi-Chore of responsibility for the Code and Cynthia's care.

30.  Had an EKG been ordered and performed, it would have provided a snapshot of Cynthia's heart function at the time the EKG was performed.  The failure to perform an EKG is not a factor here, because Gwayi-Chore's stethoscopic cardiac exam provided a snapshot of Cynthia's heart function, and it disclosed nothing

7

abnormal. There is insufficient evidence to support a conclusion that an EKG taken at the earliest reasonable time would have yielded a result different from the result of the stethoscopic exam. The court therefore finds that not ordering an EKG did not affect Cynthia's outcome.

31. From the evidence the court finds that the earliest Gwayi-Chore could have ordered urine and blood tests would have been at the time she ordered the Protonix, Zofran, and the LR. Had she done so, it is reasonable to conclude from the evidence, and the court finds that the blood would have been drawn as the IV line was placed at about 1900 and the urine sample would have been obtained before Moughamian left Cynthia's room at 1922. It is also reasonable to conclude from the evidence, and the court finds that Moughamian would have taken or sent the blood and urine samples to the MMC laboratory after 1922 when he commenced the LR and then left Cynthia's room.

32. There is insufficient evidence to support a conclusion that the results of the urine and blood tests would have been obtained, returned to the ER, and reviewed prior to 1950 when the Code was called. The court therefore finds that not ordering blood and urine tests did not affect Cynthia's outcome.

33. Given the findings of fact in paragraphs 30 and 32, the court finds it unnecessary to determine whether Cynthia declined an EKG, blood testing, and urine testing.

34. Diane Sixsmith, M. D. ("Sixsmith") is board certified in emergency room medicine and internal medicine. Sixsmith was retained by plaintiffs who tendered Sixsmith as an expert in emergency medicine and internal medicine. The court found

on the record without objection by defendant that Sixsmith is qualified to offer opinion testimony in emergency medicine and internal medicine.

35.  Sixsmith was also tendered as an expert with respect to the standards of care applicable to nurses working in emergency rooms.  Defendant did not object, and the court found Sixsmith qualified to offer opinion testimony in that field.

36.  Gaylene Soniak-Tays, M.D.("Tays") is board certified in family practice medicine.  She has also worked as an emergency room physician since 1985.  At times she worked full time as an emergency room physician, but for most of her career her emergency room work was part time.  Over plaintiffs' objection, the court found on the record that Tays is qualified to offer opinion testimony in emergency medicine.

37.  Sixsmith testified, and the court finds, that the standards for emergency room care applicable to MMC are national standards of care.

38.  Sixsmith testified, and the court finds, that an ER doctor is required by the applicable standard of care to make a differential diagnosis when examining a patient. The differential diagnosis need not be written down, but it must be undertaken by the ER doctor.

39.  A differential diagnosis is a list of conditions that may apply to the patient based on the ER physician's assessment of various risk factors.  The risk factors include the patient's medical history; the patient's presenting complaints, signs and symptoms; the patient's current vital signs and other current observations of the patient by nurses and the physician; the patient's age; the patient's gender; and sometimes the patient's ethnicity.

40.  A differential diagnosis should always take into account and attempt to rule out the worst condition consistent with the patient's presenting complaints, signs, and symptoms.  The worst condition in a differential diagnosis is not the worst condition imaginable which is consistent with the complaints, signs, and symptoms.  It is the worst condition consistent with the presenting complaints, signs, and symptoms viewed in light of all the risk factors.

41.  A differential diagnosis is used to make decisions on testing and treatment to rule out various conditions and eventually to reach a final diagnosis of the patient's condition.

42.  Gwayi-Chore did not do a differential diagnosis, and did not reach a final diagnosis of Cynthia's condition.

43.  Sixsmith testified that Cyhnthia's complaint of severe epigastric pain described as heartburn coupled with nausea and vomiting taken in light of Cynthia's medical history reflected in the paper chart established that a diagnosis of acute coronary syndrome should have been considered.

44.  Tays testified that a diagnosis of acute coronary syndrome should not have been considered.  Her opinion was based in part on the fact that Cynthia denied chest pain.  However, the court finds from all the evidence that women with acute coronary syndrome sometimes present with no complaint of chest pain.

45.  Tays also testified that another basis for her opinion was that a patient suffering severe pain for 15 hours would not likely be on the verge of a cardiac event.  However, the evidence does not show how long before Cynthia went to MMC that her pain became severe.

46.   On cross-examination, Tays testified that nausea, vomiting, heartburn, and severe epigastric pain are all symptoms of acute coronary syndrome.

47   Sixsmith's opinion is more persuasive than Tays' opinion.  Gwayi-Chore should have considered a diagnosis of acute coronary syndrome for Cynthia.

48.   Sixsmith testified that given Cynthia's presentation and the medical history in the paper chart, the applicable standard of care required that Cynthia be placed on the available monitoring equipment, and it was a breach of the standard of care not to put Cynthia on a cardiac monitor, a pulse oximetry monitor, and a blood pressure monitor. Tays' opinion was that such monitoring was not called for in Cythia's case.  However, Tays testified on cross-examination that if she had a patient who presented with symptoms she believed were symptoms of acute coronary syndrome, then she would place the patient on the monitors.

49.   Sixsmith's opinion is more persuasive than Tays' opinion regarding the need for monitoring.  Gwayi-Chore breached the applicable standard of care by failing to order cardiac monitoring, pulse-oximetry, and blood pressure monitoring for Cynthia.

50.   Once an ER patient is placed on automatic monitoring devices, they are left on the patient until the patient is taken from the treatment room and discharged.

51.   Had Cyhthia been on automatic monitoring, ER personnel would have received a warning as soon as any of the monitors detected a reading outside the ranges set for the monitoring device.  This means that ER personnel would have responded to Cynthia sooner than 1950 when the Code was called.

52.  After the Code was called, there was no violation of any applicable standard of care.  Significantly, the prompt use of the defibrilator on the crash cart managed to restore Cynthia's heart to normal functioning after she had entered asystole.

53.  Sixsmith opined that had ER personnel responded immediately upon receipt of a warning from the monitoring devices, their treatment would have prevented Cynthia's decline into asystole and that Cynthia would not have suffered an anoxic brain injury.

54.  The court accepts Sixsmith's opinions and finds that with automatic monitoring, there would have been an earlier response to the deterioration in Cynthia's condition, Cynthia would have been promptly shocked with the defibrilator on the crash cart, the shock would have restored Cynthia's heart activity to a normal state, Cynthia would not have entered asystole, and Cynthia would not have suffered an anoxic brain injury.

55.  In addition to offering Sixsmith's opinions on the standard of care applicable to nurses working in emergency rooms, plaintiffs offered the testimony of Susan Smith, DPN ("Smith").  The court found on the record and without objection from defendant that Smith is qualified to offer opinion testimony on the standard of care applicable to nurses working in emergency rooms.

56.  Defendant also called an expert in nursing practices, Sandra Mobley ("Mobley").  The court found on the record and without objection from plaintiffs that Mobley is qualified to offer opinion testimony on the standard of care applicable to nurses working in emergency rooms.

57.  Sixsmith testified that with Cynthia's presentation and medical history she should have been placed on cardiac monitoring, blood pressure monitoring, and pulse oximetry.  She further testified that Hrinko and Moughamian's failure to place Cynthia on the monitors was a cause of the harm to Cynthia.  Smith testified that the applicable standard of care required that Cynthia be placed on the available monitoring equipment and that it was a breach of the nursing standard of care not to place Cynthia on automatic monitoring.  Mobley testified that the nurses met the applicable standard of care in their assessment and care for Cynthia.

58.  Of the three expert opinions offered with respect to the nurses, the court finds Smith's the most persuasive by virtue of her more than 40 years of experience in emergency room nursing and her advanced educational qualifications.  It is also significant that Smith's opinion is bolstered by Sixsmith's opinion.

59.  Had the nurses placed Cynthia on cardiac monitoring, blood monitoring, and pulse oximetry, there would have been an earlier response to the deterioration in her condition, Cynthia would have been promptly shocked with the defibrilator on the crash cart, the shock would have restored Cynthia's heart activity to a normal state, Cynthia would not have entered asystole, and Cynthia would not have suffered an anoxic brain injury.

60.  The court finds that the violation of the applicable standards of care by Gwayi-Chore and the nurses does not rise to the level of reckless conduct as that term is used in AS 09.55.549(f).  Had they actually read (instead of negligently not reading) the paper chart and then failed to place Cynthia on monitoring, that would have been reckless conduct.

61.  Plaintiff presented testimony by Michael Freeman ("Freeman") with respect to Cynthia's life expectancy.  The court found on the record, without objection from defendant, that Freeman is qualified to offer opinion testimony concerning life expectancy.  Freeman opined that Cynthia had a life expectancy of at least 20 years at the time of trial.

62.  Defendant presented testimony by Robert Shavelle ("Shavelle") with respect to Cynthia's life expectancy.  The court found on the record, without objection from plaintiffs, that Shavelle is qualified to offer opinion testimony concerning life expectancy.  Shavelle opined that Cynthia had a life expectancy of 9 years at the time of trial.  That opinion did **not** rely on the fact that Cynthia was recently put on a ventilator, which could increase her risk of infection and possibly lower her life expectancy.

63.  The court finds Shavelle's opinion much more persuasive than Freeman's opinion. Freeman's opinion largely rests on a single study of a population dissimilar to Cynthia, which found a life expectancy of 11 years.  Freeman added a minimum of 9 years to that life expectancy for reasons that were not convincing.  Shavelle's testimony explained in considerable detail why Freeman's addition of 9 years is misguided.  Shavelle relied on a larger array of studies than Freeman.  Shavelle's methodology was clearly explained in his testimony.  Shavelle's opinion is more consistent with the medical literature.  Shavelle's opinion is less speculative than Freeman's opinion.  Plaintiffs' argument about lack of data preservation by Shavelle is a red herring.  The data Shavelle relied upon generally was taken from publicly maintained data bases.

64. The court finds that Cynthia's life expectancy at the time of trial was 9 years.

65. Plaintiffs presented the testimony of Edgar Franklin Livingstone, M. D. ("Livingstone"). Livingstone is board certified in the field of physical and rehabilitative medicine. The court found on the record, without objection from defendant, that Livingstone is qualified to offer opinion testimony in physical and rehabilitative medicine.

66. In addition to reviewing Cynthia's medical records and photos and the videos taken by Cynthia's family members when visiting Cynthia at the Sandra Baker Home, Livingstone examined Cynthia on March 28, 2016, at the Sandra Baker Home. Livingstone observed no voluntary movement by Cynthia. Livingstone testified on direct that Cynthia may be in a minimally conscious state rather than a persistent vegetative state, but said that opinion fell into a gray area. He acknowledged on cross-examination that the neurologist who had examined Cynthia found her to be in a persistent vegetative state. He also testified that he was unaware of anyone improving from a persistent vegetative state to a minimally conscious state.

67. Livingstone testified that the quality of Cynthia's care at the Sandra Baker Home was good and that keeping her at that facility would be a good option.

68. Defendant presented the testimony of Deborah Lynne Doherty, M.D. ("Doherty"). Doherty is board certified in the field of physical and rehabilitative medicine. The court found on the record, without objection from plaintiffs, that Doherty is qualified to offer opinion testimony in the field of physical and rehabilitative medicine.

69. Doherty reviewed Cynthia's medical records and photos and the videos taken by Cynthia's family members. Doherty examined Cynthia twice at the Sandra Baker Home. Her most recent examination was on January 23, 2017. Defendant

presented a video of Doherty examining Cynthia, which Doherty explained on the record. Doherty found that Cynthia is blind. She testified that Cynthia is in a persistent vegetative state. Doherty testified that the reactions which Cynthia's family members interpreted as indications that Cynthia was aware of and responded to their presence were random behaviors exhibited by patients in a persistent vegetative state.

70. Doherty's testimony was very convincing. The court finds that Cynthia is in a persistent vegetative state and incapable of any voluntary response to her surroundings. What Cynthia's family members interpreted as responses to their presence was random involuntary behavior.

71. Doherty considered the quality of Cynthia's care at the Sandra Baker Home to be very good.

72. Plaintiffs presented three possible options for Cynthia's continuing care. The option preferred by plaintiffs is to house her in Susie's home in Anchorage. A second option–placing Cynthia in an intensive care facility in Anchorage–was ruled out by the evidence at trial which showed that there is only one such facility in Anchorage, that it has no bed available for Cynthia, and that it is unknown when a bed might become available. The third option is to continue Cynthia's care at the Sandra Baker Home.

73. Cynthia's family members testified that they would be willing to have Cynthia cared for in Susie's home where all but William and Martha Hacker reside. Wherever Cynthia is cared for, she will need 24 hour services from two nurses. Thus, in addition to moving Cynthia into Susie's home, where Susie and several minor children reside,

room would have to be made for two nurses to be present.  This would have a substantial impact on the privacy of the residents.

74.  Livingstone testified that it would require a major commitment from Cynthia's family to have Cynthia housed with her family.  The court does not question the sincerety of the wish by Susie and Cynthia's minor children to have Cynthia in their home.  The court does question the wisdom of that wish.  Cynthia is in a persistent vegetative state.  She has no ability to respond to her family members' presence.  Minor children will grow and change and make increasing demands on Susie's time and energy.  Susie, herself, is still quite young.  Her own interests and needs will change over time.

75.  The court finds that it is inappropriate to care for Cynthia in Susie's home. The court finds that the appropriate place in which to care for Cynthia is the Sandra Baker Home.

76.  Plaintiffs presented testimony from Jill Friedman ("Friedman"), a nurse who has worked in the field of rehabilitative nursing since 1980.  She was tendered as an expert in life care planning.  The court found on the record, with no objection from defendant, that Friedman is qualified to give opinion testimony in the field of life care planning.  Friedman offered three life care plans: one for Cynthia's care in Susie's home, another for Cynthia's care in a critical care home in Anchorage, and one for Cynthia's care in the Sandra Baker Home.

77.  Defendant presented testimony from Carl Gann ("Gann") who has worked as a rehabilitation counselor and life care planner for 39 years.  Gann was tendered as an expert in life care planning.  The court found on the record, with no objection from

plaintiffs, that Gann is qualified to give opinion testimony in the field of life care planning. Gann provided three life care plans: one for Cynthia's care in Susie's home, one for Cynthia's care in an Anchorage critical care facility, and one for Cynthia's care at the Sandra Baker Home.

78. Friedman worked with Livingstone in developing her life care plans. Friedman assumed the minimum twenty year life expectancy determined by Freeman.

79. Gann worked with Doherty in developing his life care plans. Gann assumed the nine year life expectancy determined by Shavelle, which has now been accepted as correct by the court.

80. The plans offered by Friedman and Gann can be adjusted to fit a life expectancy different from the life expectancy assumed by the authors.

81. After hearing the testimony from Friedman and Gann and evaluating their respective plans relating to care at the Sandra Baker Home, the court finds Gann's plan provides a better basis for assessing Cynthia's care needs for the remainder of her life. Gann's plan accepts some of Friedman's price estimates and some of her annual quantity determinations. Where Gann's plan differs from Friedman's plan, Gann's plan generally provides information explaining the difference. The court accepts Gann's life care plan which provides for Cynthia's care at the Sandra Baker Home.

82. Gann did not include sales taxes on the cost of goods needed for Cynthia's care. There was no testimony about whether Friedman included sales taxes in her plan. If she did, then in those cases where Gann accepted Friedman's prices, sales taxes are included. There was no testimony that sales taxes would be levied on services provided to Cynthia. It is reasonable to assume that sales taxes will be paid

on some goods required for Cynthia's care, but no party presented any evidence from which the court can determine which goods will be subject to sales taxes, the rates at which sales taxes would be calculated, and whether sales taxes are included in those items for which Gann accepted Friedman's prices. In this evidentiary vacuum, the court cannot add an amount for sales taxes.

83. Plaintiffs presented the testimony of Hugh Richards ("Richards"), a forensic economist with a masters degree in economics. The court found on the record with no objection from defendant that Richards is qualified to offer opinion testimony in the field of forensic economics. Richards testified about the net present value of Cynthia's life care plan, the net present value of Cynthia's future economic losses, and her economic losses prior to the time of trial.

84. Defendant presented the testimony of William Brandt ("Brandt"), a forensic economist and certified public accountant with a masters degree in business administration. The court found on the record with no objection from plaintiffs that Brandt is qualified to offer opinion testimony in the field of forensic economics. Brandt testified about the net present value of Cynthia's life care plan, the net present value of Cynthia's economic losses, and her economic losses prior to time of trial.

85. Richards and Brandt employed different discount rates to calculate net present values. Brandt used long term rates for United States government securities. Richards used short term rates. Brandt testified that he used the long term rates in order to comply with AS 09.17.040(b). In pertinent part, that statute provides: "The fact finder shall reduce future economic damages to present value. In computing the portion of a lump-sum award that is attributable to future economic loss, the fact finder

shall determine the present amount that, if invested at <u>long-term</u> future interest rates in the best and safest investment, will produce . . . the amount necessary to compensate the injured party . . . ."  (Emphasis added)  The court finds it proper to use long-term United States securities rates.

86.  Brandt calculated the net present value of Gann's life care plan for the Sandra Baker Home option to be $2,116,504.  The court finds that this is the lump sum amount needed to provide for Cynthia's care for the rest of her life.

87.  Richards and Brandt both relied on a federal government statistical compilation, the Dollar Value of a Day 2012 ("Value of a Day"), in making their calculations of Cynthia's economic losses.  However, the assumptions made by Richards and Brandt in order to calculate Cynthia's economic losses included several significant differences.

88.  With respect to lost wages, Richards assumed that Cynthia would enter the job market seeking full time work when her youngest child entered first grade.  Brandt assumed that Cynthia would enter the job market seeking only part time work until the youngest child was 17 years old at which time she would seek full time work.  The evidence shows that Cynthia was a loving, caring mother who enjoyed cooking for her family and very much enjoyed spending time with her children.  That taken together with the fact that William's job keeps him away from home for half of the year persuades the court that Brandt's assumption is more reasonable than Richards' assumption.

89.  Richards assumed that Cynthia was a high school graduate, but the evidence shows that at most she had a G.E.D.  Brandt assumed Cynthia had a G.E.D. but did not graduate from high school.  According to one survey relied upon by Brandt,

persons who do not graduate high school but obtain a G.E.D. earn about 6 percent less than high school graduates.  It is reasonable to reduce Cynthia's earning capacity to reflect her educational status.

90.  In calculating Cynthia's economic losses, Richards included the value of social security benefits she could accumulate from her own work.  Brandt did not.  He testified that Cynthia's earnings would not yield benefits as high as half of the benefits based on William's earnings.  Cynthia would therefore elect to receive the higher benefits derived from and dependent on William's earnings.  The court finds this to be correct.

91.  Richards included compensation for loss of Cynthia's subsistence harvests of fish and berries.  Brandt did not.  He testified that he did not, because the Value of a Day allocates every hour to one category or another, and it includes an allocation of time to "subsistence like" activities such as planting, gardening, and harvesting vegetables and fruits.  Thus, to include anything for subsistence would be double counting.  The court recognizes that the role of subsistence in the lives of Native Alaskans is significant, not just economically, but also culturally.  Thus, some award for the cultural loss to Cynthia is appropriate, but it must be included in Cynthia's non-economic damages rather than in the calculation of her economic losses which would amount to double counting.

92.  Richards and Brandt calculated approximately the same amount for loss of household services.  The total loss calculated by Richards (i.e., both past and discounted future) is $630,888.  Brandt's corresponding number is $624,479.  The court will award $630,000.

93.  Because the court finds that Brandt's calculation of earnings losses is based on more reasonable assumptions than Richards' calculation, the court accepts Brandt's calculation of $96,811 for the loss of wages and employer provided benefits (past loss net of past tax paid plus discounted value of future loss).

94.  Defendant contends that a portion of plaintiffs' damages should be apportioned to Snyder and Chapman.  The only witness questioned about the possible liability of Snyder and Chapman was Smith.  She opined that Snyder and Chapman breached the standard of care when they failed to look in on Cynthia sometime between 1900 when they came on shift and the time of the Code at 1950.  She testified that they could have placed Cynthia on monitoring had they believed she needed monitoring.  However, Smith had no opinion on whether Snyder or Chapman contributed to Cynthia's injury.  There is insufficient evidence in the record to apportion some of the damages to Snyder or Chapman under AS 09.17.080.

95.  Cynthia's injury is a severe permanent physical impairment.  The result is that the limitation on plaintiffs' recovery of non-economic damages is the limit set in AS 09.17.10(c), which is the higher of $1,000,000 or the product of the person's life expectancy multiplied by $25,000.  Cynthia's life expectancy for this purpose is her life expectancy had there been no brain injury.  There is insufficient evidence in the record to support a conclusion that absent the brain injury Cynthia would have lived more than 40 years beyond October 19, 2013 (40 x $25,000 = $1,000,000).  The court finds that the statutory limit is $1,000,000.

96. The court finds that the evidence of Cynthia's non-economic damages plus the substantial losses of consortium suffered by William and Cynthia's four surviving

children who were deprived of many years of care from and companionship of a cheerful, hardworking and loving spouse and parent are so substantial that an award equivalent to the applicable limit of $1,000,000 is appropriate.

97.  In his closing argument, plaintiffs' counsel asked for a $2 million dollar award for Cynthia's non-economic damages, $200,000 for William and $100,000 for each of the four children.  The court cannot award more than the $1 million limit, because the court has found that defendants did not engage in reckless conduct.  However, the court finds no reason to depart from the allocation inherent in the amounts requested by plaintiffs' lawyer.  Using that allocation, Cynthia has $769,000 in non-economic damages, William has $77,000 in non-economic damages, and each of the four children has $38,500 in non-economic damages.                   ,

98.  Based on the findings in paragraphs 86, 92, 93, and 97, Cynthia is awarded $3,612,315.  Based on the findings in paragraph 97, William is awarded $77,000, and each of the four children is awarded $38,500.

### III.  CONCLUSIONS OF LAW

1.  The substantive law which applies is the law of the State of Alaska where the events took place.  28 U.S.C. § 2674 (United States liable in same manner and to same extent as private litigant in same circumstances).

2.  Under Alaska law, to recover damages on a medical malpractice claim a plaintiff must prove by a preponderance of the evidence the degree of care ordinarily exercised by the health care provider in the field in which the defendant health care provider is practicing (the standard of care), that the defendant failed to exercise that

degree of care (breached the standard of care), and that the failure proximately caused injuries which would not otherwise have been incurred. AS 09.55.540.

3. Plaintiffs proved by a preponderance of the evidence the standard of care applicable to Gwayi-Chore who was a doctor practicing in the field of emergency room medicine and that Gwayi-Chore breached the standard of care.

4. Plaintiffs proved by a preponderance of the evidence the standard of care applicable to Hrinko and Moughamian who were practicing in the field of emergency room nursing and that each of them breached the standard of care.

5. Plaintiffs proved by a preponderance of the evidence that the breaches by Gwayi-Chore, Hrinko and Moughamian proximately caused injuries that would not otherwise have been incurred.

6. Plaintiffs proved by a preponderance of the evidence that the net present value of life care for Cynthia is $2,116,504.

7. Plaintiffs proved by a preponderance of the evidence that the past and net present value of Cynthia's economic damages for lost household services is $630,000.

8. Plaintiffs proved by a preponderance of the evidence that the past and net present value of Cynthia's economic damages for lost income and benefits is $96,811.

9. Plaintiffs proved by a preponderance of the evidence that the value of Cynthia's non-economic damages is $769,000.

10. Plaintiffs proved by a preponderance of the evidence that the value of William's non-economic damages is $77,000.

11. Plaintiffs proved by a preponderance of the evidence that the value of Martha Hacker's non-economic damages is $38,500.

12.  Plaintiffs proved by a preponderance of the evidence that the value of minor child M.T.'s non-economic damages is $38,500; that the value of the first minor child T.T.'s non-economic damages is $38,500; and that the value of the second minor child T.T.'s non-economic damages is $38,500.

13.  Plaintiffs may not recover costs or attorneys' fees.  *Anderson v. United States*, 127 F.3d 1190, 1191-92 (9th Cir. 1997).  Plaintiffs may not recover pre-judgment interest.  28 U.S.C. § 2674.

## IV.  DIRECTION FOR ENTRY OF JUDGMENT

The Clerk of Court is directed to enter judgment against defendant United States of America such that William Tate and Susie Sours as Co-Guardians of Cynthia Tate recover $3,612,315; that William Tate and Susie Sours as Co-Guardians of the minor M.T. recover $38,500, that William Tate and Susie Sours as Co-Guardians of the first minor identified as T.T. recover $38,500; that William Tate and Susie Sours as Co-Guardians of the second minor identified as T.T. recover $38,500; that William Tate individually recover $77,000; and that Martha Hacker recover $38,500.

Dated this 12th day of June 2017.


/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT